IRVING, J.,
for the Court.
¶ 1. Kevin Eugene Owen was convicted by a jury in the Forrest County Circuit Court of armed robbery and sentenced to twenty-five years in the custody of the Mississippi Department of Corrections. Aggrieved, he appeals and asserts that the trial court erred in denying his motion to suppress and in violating his constitutional right to confront a witness against him.
¶ 2. Finding no reversible error, we affirm Owen’s conviction and sentence.
*1148 FACTS
¶ 3. At approximately 1:00 a.m. on May 2, 2007, a Circle K gas station located in Hattiesburg, Mississippi, was robbed at gunpoint. Shortly thereafter, Owen was arrested near the scene of the crime and was identified by the store clerk as the person who had committed the robbery. Owen was subsequently indicted for armed robbery. Prior to his trial, Owen filed a motion to suppress. The trial court denied Owen’s motion, and the case proceeded to trial.
¶4. Paul Holmes, an employee at the Circle K, was working the night shift and testified that during the early morning hours of May 2, 2007, a man entered the store, pointed a small-caliber handgun at him, and demanded money. He testified that the perpetrator wore a white shirt, a pair of blue shorts with black trim, and white tennis shoes with red soles. Holmes described the perpetrator as “a white male with a T-shirt pulled up over most of his face.” According to Holmes, he gave the perpetrator sixty-six dollars in cash and the perpetrator quickly left the store. Holmes immediately called 911, and officers with the Hattiesburg Police Department arrived within a few minutes. Holmes testified that the robbery had been captured by the store’s surveillance system and that he turned over the digital versatile disc (DVD) that he had removed from the surveillance equipment to the officers. He recalled that the officers left the store after viewing the DVD several times.
¶ 5. Holmes stated that although he did not get a complete view of the perpetrator’s face, he saw his eyes and was certain that Owen was the person who had committed the robbery. Holmes recalled that he identified Owen as the perpetrator as Owen sat in the patrol car. Holmes testified that Owen had on a gray shirt instead of the white shirt that he wore during the robbery, gray shorts with black trim, and the white tennis shoes with red soles. Holmes stated that Owen’s legs “looked the same” as the perpetrator’s legs. Finally, Holmes did not recall the perpetrator having a tattoo on his arm.
¶ 6. Officer Earthy Donald, an officer with the Hattiesburg Police Department, testified that he and Officer Zachary Robinson responded to the Circle K shortly after receiving a call that the store had been robbed by a white male.[1] However, according to Officer Donald, Officer Peggy Sealy had already secured the scene and determined that the perpetrator was no longer in the store. Officer Donald stated that they then checked the area to see if the perpetrator was nearby. He testified that they saw a white male approximately one hundred yards from the store dressed in a wrinkled gray T-shirt, light blue shorts with dark trim, and red and white tennis shoes. The officers made a field contact report and learned that the man’s name was Kevin Owen, but made no arrest at that time.
¶ 7. According to Officer Donald, they then returned to the store and viewed the surveillance video. The officers concluded that Owen matched the appearance of the perpetrator in the video. Therefore, they returned to the location where they had previously encountered Owen. They located him about four hundred yards from where they had previously come into contact with him. Officer Donald recalled that Owen’s clothing was somewhat different, as he was wearing dark gray shorts *1149 with dark gray trim. Officer Donald later learned that the shorts were reversible, gray on one side and blue on the other. Officer Donald stated that he logged the shorts in as blue. Officer Donald testified that he placed Owen under arrest and transported him back to the store. Officer Donald stated that they brought Holmes out of the store, and that Holmes identified Owen as the person who had committed the robbery. Officer Donald testified that he recovered a key to a motel room and a cellular telephone on Owen’s person during a pat-down search. According to Officer Donald, Owen informed him that the key was for a room that Owen was renting at the Broadway Inn in Hatties-burg. Officer Donald stated that he asked Owen for permission to search the room because he had been unable to locate the weapon that was used in the robbery. Officer Donald testified that Owen verbally consented to the search of the room and that he, Officer Robinson, and Owen went to the room at the Broadway Inn. Officer Donald stated that they did not recover a weapon, the money taken during the robbery, or the T-shirt that the perpetrator wore on his head during the robbery. However, he stated that they seized clothing and tennis shoes.
¶ 8. Officer Sealy testified that she was on patrol in the area near the Circle K during the early morning hours of May 2 when she received information that the Circle K on Broadway Drive had been robbed. She then went to the store and learned from Holmes that the store had been robbed by a white male wearing “bluish-type shorts with a dark colored trim” and a white shirt and white shoes that had red soles. Officer Sealy recalled that she then dispatched the description of the perpetrator to other officers. Officer Sealy recalled that when Owen was brought back to the scene, the tennis shoes that he was wearing “matched perfectly” with those that the perpetrator wore in the video. However, she noted that Owen’s shorts were a different color than the shorts worn by the person in the video, but she added that they were the same design. Officer Sealy also noted that the report taken shortly after Owen’s arrest mistakenly indicates that he had on blue shorts when he actually wore gray shorts at that time.
¶ 9. Jeff Byrd, an identification technician at the Forrest County Regional Jail at the time of Owen’s arrest, testified that as part of the identification process, Byrd took note of Owen’s tattoos. Specifically, Byrd stated that he noticed that Owen had a tattoo of a small letter “K” on his left forearm, among others. Byrd testified that he relied on the inmates to disclose their non-visible tattoos to him, while he noted the tattoos that were visible without the inmate removing any clothing. According to Byrd, he would go further only if he later learned that an inmate failed to disclose all of his tattoos. Byrd testified that sometime after Owen was arrested, he received pictures dated May 28, 2007, from the district attorney’s office that showed that Owen had another, larger tattoo on his left forearm. Byrd also stated that Owen did not have this larger tattoo when he processed him immediately following his arrest. Byrd stated that he then confronted Owen about the new tattoo, but that Owen “acted like he didn’t know what [I] was talking about” when Byrd asked him what happened to the tattoo of the “K” that had been on his left forearm.
¶ 10. Glen Nobles, former staff sergeant at the Forrest County Regional Jail, testified that he came in contact with Owen approximately five months after Owen had been incarcerated. According to Nobles, Owen had a large “jailhouse” tattoo on his left forearm.
*1150 ¶ 11. Gregory Smith, an inmate at the jail, also testified for the State. He stated that he met Owen in June 2008 and that Owen asked him for some Vaseline or baby oil to put on a tattoo that Smith described as “chapped.” Smith testified that Owen discussed the tattoo with him after Owen’s discussion with Byrd. Smith stated that Owen told him that the tattoo that Byrd had a record of “could never be identified” because of the new tattoo.
¶ 12. Carolyn Owen, Owen’s mother, and Tonia Colbert, Owen’s brother’s girlfriend, both testified that Owen got the large tattoo on his left forearm at a family reunion in August 2005. Brandon Grace, Owen’s former co-worker, testified that Owen had the large tattoo on his left forearm when they worked together in the winter of 2006.
¶ 13. Owen testified on his own behalf and denied robbing the Circle K. He stated that he was in his room at the Broadway Inn during the early morning hours of May 2, 2007, when he decided to go to the motel’s vending machine. According to Owen, when he got to the vending machine, he realized that he did not have any money, so he walked to the front of the building. He testified that he was on his way to a friend’s home when he encountered Officers Donald and Robinson. He stated that the officers briefly questioned him before he continued walking north on Broadway Drive. Owen testified that he went to his friend’s home but that he decided to return to the motel when no one answered the door. Owen stated that Officers Donald, Robinson, and Sealy approached him as he walked and escorted him to his motel room. Owen disputed Officer Donald’s testimony that he had his motel room key on his person. He testified that the officers had to get a key from the front desk because he did not have the key with him. Owen also disputed that he was wearing tennis shoes when he came into contact with the officers. Rather, Owen stated that he was barefoot. Owen testified that the tennis shoes were already in the patrol car when he got in. He denied owning them and stated that they were not his size. Further, Owen disputed the sequence of events regarding when he was taken to the motel and when he was taken to the store. According to Owen, he was taken to the Circle K after he was taken to the motel room, not before. Owen stated that it was at that point that Holmes was brought to the patrol car to identify him.
¶ 14. Owen testified that Byrd asked him whether he had a tattoo on his left forearm, and he responded that he did. He stated that Byrd did not ask him any specific questions about his tattoo. Owen stated that he had a “K” tattoo on his left forearm until August 2005, at which point he got another tattoo on top of it. Owen explained that the “K” is still technically on his forearm but that it is covered by the larger tattoo. As did Carolyn and Colbert, Owen testified that he got the tattoo at a family reunion in August 2005. Further, he denied asking Smith for Vaseline or baby oil. He suggested that Smith was lying to get back at him because he had once refused to give Smith a candy bar and because he had told Smith that he did not approve of Smith’s homosexual lifestyle.
¶ 15. The jury convicted Owen as charged.
¶ 16. Additional facts, as necessary, will be related during our analysis and discussion of the issues.
ANALYSIS AND DISCUSSION OF THE ISSUES

1. Motion to Suppress

¶ 17. Owen asserts that the show-up identification was unduly prejudicial *1151 and should have been suppressed. An appellate court “will reverse the denial of a motion to suppress only if the trial court’s ruling is manifest error or contrary to the overwhelming weight of the evidence.” Ruffin v. State, 992 So.2d 1165, 1169(¶8) (Miss.2008) (citing Palm v. State, 748 So.2d 135, 142(¶ 25) (Miss.1999)). Furthermore, as it relates to show-up identification procedures, the United States Supreme Court has clearly stated that “the primary evil to be avoided is ‘a very substantial likelihood of irreparable misidenti-fication.’ ” Neil v. Biggers, 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) (quoting Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)). The Neil court further held that “[s]uggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous.” Id. Nevertheless, the Court held that “the admission of evidence of a showup without more does not violate due process.” Id. The Neil court also set forth factors in “evaluating the likelihood of misidentification”: (1) “the opportunity of the witness to view the criminal at the time of the crime,” (2) “the witnesses] degree of attention,” (3) “the accuracy of the witnesses] prior description of the criminal,” (4) “the level of certainty demonstrated by the witness at the confrontation,” and (5) “the length of time between the crime and the confrontation.” Id. at 199-200, 93 S.Ct. 375.
¶ 18. Owen asserts that Holmes did not have an adequate opportunity to view the perpetrator while the robbery was in progress. As noted, Holmes testified that the perpetrator was not in the store for a long period of time; however, he stated that he watched the video of the robbery several times prior to the perpetrator being brought back to the store, where he ultimately identified Owen as the person who had robbed the store. Therefore, the record reflects that Holmes’s identification of Owen was based on his observation of Owen during the robbery and on his review of the surveillance video. Moreover, Holmes’s testimony at the suppression hearing was consistent with his trial testimony. Holmes’s testimony regarding his review of the video and his personal observation of Owen leads us to conclude that he paid close attention to the perpetrator prior to making the identification. Also, Holmes provided an accurate description of Owen at the suppression hearing, and there is nothing in the record to suggest that Holmes was not sure of his identification of Owen. Holmes stated that no more than thirty minutes had elapsed from the point in time that the store was robbed until the perpetrator was brought back to the store.
¶ 19. Prior to denying Owen’s motion to suppress the identification, the trial judge heard Holmes testify regarding the circumstances that led him to conclude that Owen was the person who had committed the robbery. There is no merit to this issue.

2. Confrontation Clause

¶ 20. Owen also asserts that the trial judge erred in allowing the tape-recorded statement of Charles Street, an inmate who had been incarcerated at the Forrest County Regional Jail at the same time as Owen, to be played for the jury after declaring Street unavailable as a witness pursuant to Rule 804(a)(4) of the Mississippi Rules of Evidence.[2] Specifically, Owen *1152 contends that “Street’s unsworn statement was the only statement that the jury heard that alleged Owen actively elicited [sic] help in creating a false story about his tattoo ... to avoid in-court identification.” An assistant district attorney for Forrest County testified that he spoke with Street after Street had entered a guilty plea in another matter. According to the assistant district attorney, Street’s attorney told him that Street had information that he wanted to give him. The assistant district attorney stated that he then went with Street and Street’s attorney to a conference room. There, Street informed the assistant district attorney that he had information relating to Owen and a tattoo. The assistant district attorney stated that at that point, he told Street that he would have an investigator contact him as soon as possible. Thereafter, the assistant district attorney contacted Keith Oubre, an investigator in their office, who took the tape-recorded statement from Street that, according to Owen, should not have been admitted into evidence.
¶ 21. In Bishop v. State, 982 So.2d 371, 375(¶ 15) (Miss.2008) (citing Lynch v. State, 877 So.2d 1254, 1281(¶86) (Miss.2004)), the Mississippi Supreme Court held that “[t]he admission of testimony at trial is left to the sound discretion of the trial court, and error will be found only where the trial court has abused that discretion.”
¶ 22. The record reflects that when Street took the stand he immediately began complaining of chest pains and shortness of breath and informed the trial judge that he was “dying from heart disease.” According to Street, he had not taken his medication in the days preceding his court appearance. The trial judge dismissed the jury, and the trial proceedings resumed approximately one hour later. In the meantime, the judge called for the assistance of a nurse. Thereafter, the following exchange occurred outside the presence of the jury:
[PROSECUTOR]: Your Honor, we were attempting to talk to the defendant [sic] about how he’s feeling, is he able to testify, does he want to get this over with, does he need a doctor. I’m trying to figure out if we can get his testimony done now and over with so we don’t prolong any suffering that he may be feeling.
THE WITNESS: Your Honor, I can’t do it. It’s not that I don’t want to. I can’t.
[PROSECUTOR]: Are you saying that you refuse to testify?
THE COURT: Is the nurse on the way over here?
DEPUTY SHERIFF: Yes, sir.
THE WITNESS: I’m saying I can’t do it.
[PROSECUTOR]: Maybe I’m confused. Are you saying you refuse to testify? I don’t understand.
THE WITNESS: I can’t go through with this.
[PROSECUTOR]: You can’t do it or you’re refusing to do it? It’s fairly quick and painless, that’s what I’m saying.
THE WITNESS: I can’t do it.
*1153 [PROSECUTOR]: Your Honor, could we have a second?
THE COURT: Yes. The nurse is on her way over here, Mr. Street.
(Nurse arrives and checks Mr. Charles Street)
(Court reconvened outside the presence of the jury)
THE COURT: Let the record reflect that we’ve reconvened outside the presence of the jury.
Mr. Street, if we took a recess and came back after lunch, do you think you would be able to go forward at that time?
THE WITNESS: No, sir. The bottom number of my blood pressure is down to 124. That’s extremely high. I can’t breathe, Your Hon- or.
THE COURT: Okay. If /all will, take Mr. Street back across the street.
¶ 23. Still outside of the presence of the jury, Ruby Bunkheila, the staff nurse at the jail, testified that Street had a heart condition and had been seen by a cardiologist. She further testified that Street suffered from high blood pressure and had “significant blockage.” The nurse opined that testifying would not help Street’s condition and noted that his blood pressure was elevated. The State then requested permission to introduce the synopsis of a tape-recorded statement that Street had made. Owen’s attorney objected to the use of the statement on the grounds that Street was available and simply did not want to testify and that allowing the tape into evidence would violate Owen’s right to confront a witness against him. The trial judge and attorneys listened to the tape outside the presence of the jury. The State then asked the trial judge to declare Street unavailable as a witness and requested permission to “substitute the audiotape that was given to counsel opposite in discovery as [Street’s] testimony.” Owen’s attorney outlined his reasons for his objection to the introduction of the tape; however, the trial judge allowed the tape to be played to the jury over his objection and instructed the jury as follows:
Ladies and gentlemen, prior to recessing, a Mr. Charles Street was called to testify as a witness. Mr. Street informed the Court that he was unable to go forward. Mr. Street — the nurse was brought over and confirmed that Mr. Street has a history of heart problems and that he has blockage of maybe 80 percent.
She took his blood pressure and what not and his blood pressure was some 170 over 124. He complained of shortness of breath. We offered to call an ambulance for him. He said he didn’t think he needed to go to the hospital. Apparently, Mr. Street was sent down here from Rankin County without the heart medication that he had been on.
But in any event he did not feel he could go forward. He did not feel he would be able to go forward this afternoon. This Court — because of that condition, this Court has declared that Mr. Street is unavailable as a witness in this case. That is allowing the State of Mississippi to play a tape recorded statement Mr. Street gave.
Mr. Street entered a plea in this court on or about July 8, and that conviction will be in evidence if it is not already in this court.
He entered a plea of guilty to the crime of armed robbery and was sentenced in this court.
On July 9, Mr. [Keith] Oubre, an investigator with the district attorney’s office, took a recorded statement from Mr. *1154 Street. That statement is going to be played to you at this time.
¶ 24. In Crawford v. Washington, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court set forth guidelines for the admission of a prior testimonial statement of a witness who does not testify at trial. The Supreme Court held that the Confrontation Clause to the United States Constitution bars the “admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.” Id. at 53-54, 124 S.Ct. 1354. The Crawford court further held that “when the declar-ant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements.” Id. at 59 n. 9, 124 S.Ct. 1354.
¶ 25. There is no doubt that Street’s statement to Investigator Oubre is testimonial within the meaning of Crawford. Also, it is not disputed that Street was not subject to cross-examination by Owen or anyone else at the time that he gave the statement to Investigator Oubre. Further, it is not disputed that Street appeared for trial, was sworn, but was dismissed without being subjected to either direct examination or cross-examination. Nevertheless, as stated, his prior unsworn tape-recorded statement was admitted into evidence. Clearly, Street was unavailable due to medical reasons. It is difficult for us to discern how a witness can be unavailable due to medical reasons but yet be regarded as subject to cross-examination. Therefore, we find that the trial court erred in admitting Street’s tape-recorded statement. Although, we find that the trial court erred in admitting Street’s statement, our inquiry does not end there, because constitutional violations are subject to the harmless error analysis. See Conerly v. State, 544 So.2d 1370, 1378 (Miss.1989) (citing Satterwhite v. Texas, 486 U.S. 249, 256, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988)). Therefore, we must determine whether admission of the statement is harmless error.
¶ 26. In Brown v. State, 995 So.2d 698, 704(¶ 24) (Miss.2008) (quoting Washington v. Recuenco, 548 U.S. 212, 218, 126 S.Ct. 2546, 165 L.Ed.2d 466 (2006)), our supreme court noted that the United States Supreme Court “ha[s] repeatedly recognized that the commission of a constitutional error at trial alone does not entitle a defendant to automatic reversal. Instead, ‘most constitutional errors can be harmless.’ ” The Brown court stated that the test to be applied is “whether it appears ‘beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.’” Id. at (¶25) (quoting Thomas v. State, 711 So.2d 867, 872(¶ 25) (Miss.1998)). As noted, Byrd, Nobles, and Smith all testified that Owen procured the larger tattoo on his left forearm at some point after he was incarcerated. Their testimonies are sufficient to support the jury’s verdict. Therefore, we find beyond a reasonable doubt that the erroneous admission of Street’s statement did not contribute to the verdict. Accordingly, we find this error harmless in light of all of the other evidence that was offered at trial.
¶ 27. THE JUDGMENT OF THE FORREST COUNTY CIRCUIT COURT OF CONVICTION OF ARMED ROBBERY AND SENTENCE OF TWENTY-FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
*1155 KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ„ CONCUR.

. Officer Donald testified that at this point the only description of the perpetrator was that he was a white male.

. Rule 804(a)(4) provides as follows: " 'Unavailability as a witness' includes situations in which the declarant: Is unable to be present or to testify at the hearing because of death or *1152 then existing physical or mental illness or infirmity....”