# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00239-COA

**WESLEY LITTLETON**                                      **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                      **APPELLEE**

DATE OF JUDGMENT:            12/22/2022
TRIAL JUDGE:            HON. JANNIE M. LEWIS-BLACKMON
COURT FROM WHICH APPEALED:            YAZOO COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:            MERRIDA COXWELL
            CHARLES RICHARD MULLINS
ATTORNEY FOR APPELLEE:            OFFICE OF THE ATTORNEY GENERAL
            BY: CASEY B. FARMER
DISTRICT ATTORNEY:            AKILLIE MALONE OLIVER
NATURE OF THE CASE:            CRIMINAL - FELONY
DISPOSITION:            REVERSED AND REMANDED - 07/16/2024
MOTION FOR REHEARING FILED:

**BEFORE WESTBROOKS, P.J., McDONALD AND EMFINGER, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.    Wesley Littleton appeals his Yazoo County jury conviction for the first-degree murder of Willie Thomas.  First, Littleton argues that the trial court erred by admitting evidence of an audio-recorded statement of a child witness over the objection of counsel and in violation of Littleton's Sixth Amendment right to confront the witness.  Second, he argues that the jury instructions failed to fully inform the jury of its duty regarding self-defense.  Third, Littleton argues that the State violated his Sixth Amendment right to remain silent by commenting on his post-arrest silence.  Fourth, Littleton argues he received ineffective assistance of counsel.  Upon review, we reverse and remand for a new trial.

# FACTS

¶2.    On September 17, 2021, around 4:00 or 4:30 p.m., Littleton and Thomas were at Littleton's home at 632 S. Central Alley in Yazoo City, Mississippi. Thomas's child, DJ, was also at the home, playing on his iPad.[1] Littleton and Thomas proceeded to drink and talk and eventually called a friend to pick them up so they could get some food. While waiting for the friend to arrive, Littleton and Thomas began discussing their jail experiences in Madison County. Littleton claimed he was put on a 24-hour hold before being released on bail for a DUI charge. Thomas, however, denied that such a hold was required because he had not been held for twenty-four hours prior to his release for a drug charge. This eventually escalated into an argument, and Littleton claims Thomas pointed a gun at him. Trying to diffuse the situation, Littleton claims he told Thomas and DJ to leave the home. However, at some point while Thomas was leaving the home, Littleton shot Thomas. Thomas died shortly after the shooting. Littleton ultimately surrendered himself to the Yazoo County Sheriff's Office and was charged with first-degree murder for the killing of Thomas.

¶3.    The precise details of the events leading up to and following the shooting were contested at trial and are discussed in further detail below.

*DJ*

¶4.    DJ was examined by the court prior to trial to determine if he was competent to testify. During this examination, DJ stated that he was eleven years old, that he knew the difference between the truth and a lie, and that he did not "have any problems with testifying." DJ was

---

[1]    We use a pseudonym for the child's name to protect their privacy.

2

then excused to go back to the witness room. Following this examination, the court found that DJ was of tender years but was competent to testify. However, neither the State nor Littleton ever actually called DJ as a witness.

*Deputy Nolan Warrington*

¶5.     Nolan Warrington, a deputy with the Yazoo County Sheriff's Office, testified that he was a detective at the time of the shooting and was one of the responding officers. He spoke with a number of witnesses both at the crime scene and after the shooting. He also spoke with DJ when the child's mother brought them to the sheriff's office the day after the shooting. Warrington said that it was standard practice to send minor witnesses and victims to the Child Advocacy Center (CAC), where a trained professional would conduct a forensic interview. However, according to Warrington, DJ wanted to speak only to Warrington and nobody else. So, Warrington read the *Miranda* rights[2] to DJ and Jessica Jackson, DJ's mother, and had both DJ and Jessica sign an acknowledgment that DJ was voluntarily making a statement.

¶6.     At this point during Warrington's testimony, the State then attempted to admit the audio recording of DJ's interview. However, Littleton's counsel objected, arguing that Warrington was not the proper witness to introduce the recording. A bench conference was held, and the State argued that Warrington was able to testify to the recording because he conducted the interview. Littleton's counsel argued that the recording was an attempt to "back-door" DJ's testimony without calling the child as a witness. The court pointed out that

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 479 (1966).

Littleton could call DJ as a witness, to which Littleton's counsel responded, "Yes, ma'am. I will." The court then admitted the recording of the statement, and the State proceeded to play it for the jury.

¶7. In this interview, DJ was in a room with Warrington and Jessica. Warrington asked DJ what happened at the house the night before, and the following was said:

DJ: They were arguing.

Warrington: Who was arguing?

DJ: My dad and his friend.

. . . .

Warrington: You said they were arguing. Do you know what they were arguing about?

DJ: Bail, and what time they would get out.

Warrington: Bail? Okay, so what all happened after, or while they were arguing?

DJ: He told us to leave. And while we were leaving, he shot him.

Warrington: Do you know how many times he shot?

DJ: Three?

Warrington: Three? Did you see the gun?

DJ: No.

Warrington: You didn't see it?

DJ: It was a pistol.

Warrington: It was a pistol? Did your dad have a gun or anything?

4

DJ:         Nope.

Warrington:  He didn't?  Okay.  Where did this take place?

DJ:         My dad was outside the house, and he was inside the house, and the door was open.

Warrington:  The door was open?

DJ:         That's how he shot him.

. . . .

Warrington:  Ya'll had, okay.  What did you do when you heard the shot?

DJ:         Went to see if my dad was okay.

Warrington:  Was he okay?

DJ:         No.

Warrington:  What was wrong with him?

DJ:         He was shot in the limb.

Warrington:  Can you tell me where exactly he got shot at?

DJ:         Hmmm-

Jessica:     [unintelligible]

DJ:         - In his back.

. . . .

Warrington:  So what did your dad's friend do after he shot your dad?

DJ:         He left.

Warrington:  He left?  Did he lock the house or anything?

DJ:         No.

5

Warrington:   Did anybody else lock the house?

DJ:      . . . .

Warrington:   Did he walk or did he run?

DJ:        He ran.

¶8.      Warrington testified that the house was locked when he arrived, and he obtained a warrant to enter the home.  Warrington took pictures of the inside of the home and the porch, all of which were entered into evidence.  These photographs show the front porch with a large amount of blood next to the doorway and the porch stairs.  Warrington said that this reflected where Thomas was shot, where he fell, and where he lay down after being shot.  Warrington also took photographs of a couch with bullet holes in it.  While inspecting the couch for projectiles, Warrington said he found a 9-millimeter Ruger pistol under the couch.  The pistol was fully loaded, meaning one bullet was in the chamber, and the magazine was full.  Warrington testified that based on the full magazine and chamber, this pistol had not been shot.  Warrington also found five .45-caliber bullet casings on the stove and near the fridge.  In one of the bedrooms, Warrington also found a gun box that had two unloaded magazines and a hand-grip, which he claimed was for the 9-millimeter Ruger based on the fact that the box said Ruger on it.  A photograph of this gun box was produced and submitted into evidence, but the gun box itself was never collected from the crime scene.  Warrington testified that the 9-millimeter Ruger was the only gun found at the scene of the shooting.  All this evidence was logged and submitted to the Mississippi Forensics Laboratory.

¶9.      Regarding the 9-millimeter, Warrington testified that it would not have been possible

6

for the gun to have been thrown under the couch due to its being "a hard to reach location." Warrington also testified that he found no 9-millimeter shell casings or projectiles. Based on the location of the .45-caliber casings, Warrington stated that he believed the shooter had been in the kitchen area. Based on the direction of the .45-caliber projectiles, Warrington stated that he believed the shooter was shooting from inside the home toward the front door of the home. There were no holes that suggested any bullets were shot from the front door into the home.

¶10. Warrington stated that when Littleton turned himself in, he was accompanied by his attorney. After Littleton had been informed of his *Miranda* rights, according to Warrington Littleton told him that he wanted to speak to him. Warrington advised Littleton that he (Warrington) had to set up an interview through his attorney. Despite this warning, Warrington said that Littleton told him, "F- that. I jumped the gun." At this point, Warrington told Littleton to "shut up and be quiet" because he did not want to get in trouble for violating someone's constitutional rights.

¶11. Lastly, Warrington stated that based on his investigation and the evidence he collected, he was of the opinion that Littleton shot Thomas in the back as Thomas was exiting Littleton's house.

¶12. On cross-examination, Warrington clarified that they had issues scheduling interviews at the CAC, and sometimes months would pass after the crime before an interview. This delay, in combination with DJ's request that Warrington conduct the interview, is why law enforcement did not send DJ to the CAC. Warrington said that he did not consider his

7

questioning of DJ to have been leading; rather, he maintained only ever asking DJ questions and confirming his answers. Warrington said that while parents normally do not ask the child questions during interviews, Jessica's assistance did not interfere with the interview.

*Veronica Cathey*

¶13. Cathey was Littleton's neighbor at the time of the shooting. She is also Littleton's cousin. Cathey stated that she was having drinks with a friend at her home when she heard a knock on her door. When she answered, it was Littleton. Littleton told her someone had been shot on his porch. Cathey said she did not believe him and thought it was a joke, so she went to check. When she went outside, she saw Littleton flag someone down and get in that person's car. Cathey then went to Littleton's house, where she heard DJ crying and saw a man lying on his side on the porch. She asked what happened, and DJ said, "Wesley shot my daddy." Cathey took DJ from the porch and called the police and an ambulance. She never went on the porch.

¶14. Cathey said she spoke with Thomas through the screen-door of the porch. He was bleeding but was conscious and speaking clearly. Thomas told her, "Wes shot me, man." Littleton's counsel objected to this statement, but the court allowed its admission as a dying declaration. Cathey said she helped Thomas take his shoes off through the screened-in porch door because he asked her to. At no point did Cathey see a weapon near Thomas. After that, Cathey said a man arrived, who she later learned was Wesley Woods (Littleton's father).

*Jessica Jackson*

¶15. DJ's mother, Jessica, was Thomas's ex-girlfriend. She said that she and Thomas had

8

a cordial relationship, and they shared custody of DJ. She was in Yazoo City on September 17, 2021, for a friend's birthday party. She dropped off DJ with Thomas because he asked her to bring him so he could spend time with DJ. She said she dropped Thomas and DJ off at Littleton's house. Jessica said she did not know Littleton personally, but she knew of him. Jessica clarified that "Duke" was Thomas's nickname. Jessica said Thomas was behaving like he normally would while hanging out with a friend and that Littleton did not seem upset. Jessica said Littleton greeted DJ and was generally friendly. She did not see a weapon on either Thomas or Littleton.

¶16.   At around 10 p.m., Jessica noticed a missed call from Littleton. She answered his next call, but couldn't hear him because she was in a club. At this point, she heard from a friend that Thomas had been shot. Jessica did not testify about the interview with Warrington and DJ.

   *Dr. Mark LeVaughn*

¶17.   Dr. Mark LeVaughn, a forensic pathologist with the Mississippi State Medical Examiner's Office, was accepted as an expert in the field of forensic pathology. LeVaughn testified that he did not conduct the autopsy on Thomas, but he reviewed the autopsy report prepared by another pathologist in the office and photographs of the body. The cause of death was established as a gunshot wound to the torso. LeVaughn stated that this was a "through and through" gunshot wound; thus, no projectile was recovered from the body. Based on this wound, he determined that the weapon had to have been behind Thomas, and Thomas must have been in a crouched position. LeVaughn also stated that there were no

9

other marks on the body that indicated a physical fight or altercation, such as bruising or abrasions. When asked by the State, LeVaughn said it was not possible for Thomas to have gotten that injury by being shot from the front.

¶18. On cross-examination, Littleton's counsel pointed out that the pathology report states that the cause of death was actually a "perforating gunshot wound of the right flank" rather than to the back. LeVaughn explained that, in his opinion, based on the photograph, "it was more in the back." LeVaughn also admitted that it was possible that Thomas was originally facing one direction (toward the shooter) and then moved quickly and ended up going in another direction (away from the shooter), thus causing the strange angle of the wound. He also agreed that the report stated that the entry and exit wounds were indeterminate, meaning either wound could have been an entry or exit wound. However, LeVaughn disagreed with the pathologist who performed the autopsy, prepared the report, and considered the wounds to be indeterminate. Rather, LeVaughn stated that, in his opinion, the lower wound was the entry wound, and the upper wound was the exit wound.

*Georgia Moore*

¶19. Moore was a friend of Thomas and a relative of Littleton. She was the person whom the men had contacted asking for a ride to get food. She said when she spoke with Thomas about coming to pick them up, Thomas did not seem angry.

¶20. When she arrived at Littleton's house, she texted Thomas that she was there, but he did not respond. She then tried to call Thomas, but as she hit the call button, she looked back to see if anybody was coming. At that point, she saw Thomas burst through the door, and

she saw flashes of gunfire and heard about five gunshots. She then sped off and called Thomas a minute later, and he answered. Thomas proceeded to tell Moore that Littleton shot him. She told him she was going to call an ambulance, and she went to get the street name so she could tell the ambulance where Thomas was located. After that, she went to her grandmother's house and then to her sister's house. Her sister then led the ambulance back to Littleton's house. When Moore and her sister arrived at the crime scene with the ambulance, Cathey was with DJ. Moore took DJ and gave him to one of Thomas's cousins, Kela.

*Felicia McIntire*

¶21. Felicia McIntire was the section chief over the firearm-and-tool-marks division of the Mississippi Forensics Laboratory. She inspected the 9-millimeter Ruger, the casings, and the projectiles that were recovered at the scene of the shooting. She established that the casings and projectiles recovered from the scene were designed for a .45-caliber handgun, so they could not have been shot from the 9-millimeter Ruger. However, McIntire also testified that no fingerprint analysis was ever done on the 9-millimeter Ruger; instead, a serological (DNA) exam was done, but it was indeterminate.

*Wesley Littleton*

¶22. After the State presented its case, Littleton moved for a directed verdict, which the trial court denied. Littleton then testified in his own defense, recounting his version of the events. On the day of the shooting, Littleton got a call from Thomas asking if he wanted to hang out. Jessica dropped off Thomas and DJ around 4:30 p.m. After Jessica left, the three

11

stood in the yard and talked and eventually went inside. DJ played on his tablet while Thomas and Littleton spoke about plans for the evening. They decided to get seafood and eventually contacted Georgia Moore to pick them up. While waiting for Moore, he (Littleton) and Thomas started discussing the bail procedure in Madison County. The discussion eventually spiraled into a disagreement over whether the police had to hold a person for twenty-four hours for a DUI charge. Littleton said this argument took place at the kitchen table. DJ was sitting on the couch in the living room, which was visible from the kitchen table.

¶23. When Thomas started getting angry, he began to smack the table, and Littleton asked Thomas to leave. At this point, according to Littleton, Thomas "jumped up and grabbed his gun off the table and put it to my head, told me he would f- me up in my house." Littleton then put his hands up and asked Thomas to leave again. Thomas then gathered DJ and walked out the door onto the porch and down the steps, still holding his 9-millimeter Ruger. Littleton then stood up to close the door, and that is when he saw Thomas coming back up the steps with his gun still in hand. Littleton said that DJ was not with Thomas at this point. Thomas then pointed his gun back at Littleton and went to cock it. At this point, Littleton said he started shooting because he thought Thomas was going to kill him.

¶24. After Littleton shot several times, Thomas dropped his gun on the floor, backed out of the doorway, and sat down on the porch while telling Littleton he was shot. Littleton approached the door, and as he did, he kicked the 9-millimeter Ruger under the couch. Littleton then told Thomas he was going to get help, and he ran to Cathey's house and asked

12

her to call an ambulance. Littleton flagged down a man he knew who cut his grass and asked for a ride to the community center because at this point he was panicking. There, Littleton called his dad and asked him to go to Littleton's house to see what was going on. In the next two days, Littleton proceeded to contact counsel and turned himself in to the police.

¶25.    Littleton said Thomas's gun was a 9-millimeter Ruger. Meanwhile, Littleton had his own .45-caliber Ruger in his waistband. Littleton said that the gun box that Warrington found in Littleton's room was actually for his .45-caliber Ruger, not Thomas's 9-millimeter Ruger.

¶26.    Littleton said that he had seen Thomas get angry and act like a bully before, specifically when talking to Jessica. However, Thomas had never behaved aggressively toward Littleton and had never pulled a gun on him. He said Thomas's behavior shocked him that night, and that was why he originally asked Thomas to leave.

   *Wesley Woods*

¶27.    Littleton's father, Wesley Woods, said that Littleton called him and told him he had shot someone and asked him to go to Littleton's house to see what was going on. When Woods got there, Thomas was still on the porch. He saw a little boy[3] with a woman, and the woman said that Littleton had told her to call the police and ambulance.[4] Woods asked the woman what happened, but she said she did not know but that DJ was there. Woods then

---

   [3] Woods did not say whether this child was DJ because he did not know who DJ was at the time, but both the State and Littleton agree that this was DJ.

   [4] Woods did not say whether this woman was Veronica Cathey, but both the State and Littleton agree that it must have been Cathey.

asked DJ what happened, and DJ said, "I don't know, all I did was heard shooting."[5]

¶28.   Following Woods's testimony, the defense rested.

*Jury Instructions Conference*

¶29.   Littleton submitted jury instruction D-2 on self-defense.  This instruction read:

> The Court instructs the jury that in order for the Defendant Wesley Littleton to claim the defense of self-defense, the Defendant must have reasonably believed that Willie Thomas intended to kill him and that the Defendant reasonably believed that Willie Thomas was about to carry out actions against the Defendant.
>
> The Defendant does not have to prove that he acted in self-defense. The State has the burden of proving beyond a reasonable doubt that the Defendant did not act in self-defense.
>
> If you find that the State did not prove beyond a reasonable doubt that the Defendant did not act in self-defense, then you shall find the Defendant not guilty of Murder.

However, the court did not submit this instruction and, instead opted for an amended instruction which did not include the last sentence of the above instruction (i.e. that if the State fails to prove Littleton acted in self-defense, "then you shall find the Defendant not guilty of murder.").

¶30.   The State submitted a jury instruction on first-degree and second-degree murder, which read in pertinent part:

> The Court further instructs you that if you believe from the evidence in this case, beyond a reasonable doubt, that:
>
> (1) the Defendant, Wesley Littleton, on or about September 17,

---

[5]  The State argued that this was hearsay and that because DJ was present and able to be examined, this evidence should not be admitted as an exception.  However, after laying the foundation, the statement was allowed as an excited utterance exception to hearsay.

14

2021 in Yazoo County, Mississippi;

(2) did willfully, unlawfully, and feloniously, while in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to affect the death of any individual did kill Willie Evans Thomas, Jr.

then Wesley Littleton is guilty of Second-Degree Murder, and it is your sworn duty to so find.

Should the State fail to prove any of these elements, then you must find the defendant not guilty of Second-Degree Murder.

¶31. The State also submitted an instruction regarding self-defense and excessive force, which read:

The Court instructs the jury that one who claims self-defense as a defense to his actions may not use excessive force to repel the attack but may use only such force as is reasonably necessary under the circumstances. If you find from the evidence, beyond a reasonable doubt, that the Defendant, Wesley Littleton, used more force than was reasonably necessary under the circumstances, then the Defendant may not use self-defense as a defense to his actions.

Lastly, the State submitted an instruction on self-defense and apparent danger, which read:

The Court instructs the jury that while it is true that under the law a person has the right to repel force with force in self-defense. However, a person may only justify such an act as self-defense if he has good reason to believe that he was then and there in danger, real or apparent, of being done great bodily harm or losing his life at the hands of the assailant. Such danger must reasonably appear to be imminent and impending; mere fear, apprehension or belief alone does not justify a plea of self-defense.

*Jury Verdict and Appeal*

¶32. After closing arguments and deliberation, the jury found Littleton guilty of first-degree murder. Littleton moved for judgment notwithstanding the verdict (JNOV) or a new

15

trial, arguing: (1) the court erred in allowing the State to admit the recording of DJ's interview without requiring that DJ first take the stand, and that the Defense contemporaneously objected to this admission; (2) allowing such admission violated Littleton's right to confrontation under the Sixth Amendment; (3) the State failed to prove beyond a reasonable doubt that the defendant did not act in self-defense; and (4) the verdict was against the overwhelming weight of the evidence. The trial court denied this motion.

¶33. Littleton appealed, raising the issues surrounding DJ's interview and further arguing that the jury instructions on self-defense failed to fully inform the jury of its duty to acquit if it found the State failed to meet its burden. Littleton also raised, for the first time on appeal, that the prosecution violated his right to remain silent by commenting on his post-arrest silence. Lastly, Littleton argues he received ineffective assistance of counsel for failure to question and strike potentially prejudicial jurors, failure to object to constitutional violations, failure to investigate the gun box, and failure to propose jury instructions informing the jury of their duty regarding self-defense and on the Castle Doctrine and imperfect self-defense.

## STANDARD OF REVIEW

¶34. Our Court reviews challenges based on a violation of the Confrontation Clause de novo. *Garlington v. State*, 349 So. 3d 782, 807 (¶89) (Miss. Ct. App. 2022) (citing *Williams v. State*, 281 So. 3d 263, 266 (¶8) (Miss. Ct. App. 2019)). Our Court reviews the challenges to the jury instructions here under an abuse-of-discretion standard. *Baker v. State*, 315 So. 3d 558, 563 (¶13) (Miss. Ct. App. 2021) (citing *Newell v. State*, 49 So. 3d 66, 73 (¶20) (Miss.

16

2010)). "Plain error exists where such error affects the defendant's substantive/fundamental rights, even though no objection was made at trial." *Galloway v. State*, 122 So. 3d 614, 630 (¶18) (Miss. 2013).

## DISCUSSION

### I. Whether the court erred in admitting the recording of DJ's interview.

¶35. Littleton argues that the trial court should not have allowed the State to introduce DJ's audio-recorded interview through Deputy Warrington's testimony over Littleton's Confrontation Clause objection based on the reasoning of *Crawford v. Washington*, 541 U.S. 36, 38 (2004). In *Crawford*, the United States Supreme Court held that "[t]estimonial statements of witnesses absent from trial have been admitted *only where the declarant is unavailable*, and *only where the defendant has had a prior opportunity to cross-examine* [*the witness*]." *Id.* at 59 (emphasis added). Littleton argues that because the State did not call DJ to testify *at all*, this shifted the burden to Littleton to call DJ, an adverse witness, and prove his own innocence.

¶36. In making this argument, Littleton cites *Owen v. State*, 43 So. 3d 1146, 1154 (¶25) (Miss. Ct. App. 2010), where we considered an appeal of an armed robbery conviction in which Owen asserted that the State violated the Confrontation Clause by introducing a recorded statement of a witness without calling the witness and allowing Owen to cross-examine him. In that case, Charles Street, an inmate who was incarcerated with Owen, provided a tape-recorded statement to the prosecution alleging that Owen actively solicited Street's help to fabricate a false story about Owen's tattoo in order to avoid in-court

17

identification. *Id*. at 1152 (¶20). However, when Street took the stand, he immediately began complaining of chest pains and shortness of breath and informed the court that he was "dying from heart disease." *Id*. at (¶22). Street was taken back to the prison for medical treatment. *Id*. The State then requested permission to introduce a tape-recorded statement that Street had made, to which Owen objected on the grounds that Street was available to testify and that allowing the tape recording into evidence without Street being able to be cross-examined would violate Owen's right to confrontation. *Id*. at (¶23). In response, the State requested that the court deem Street to be unavailable as a witness based on his heart condition and allow the tape as a substitute to his testimony. *Id*. The trial court granted the State's request over Owen's objections. *Id*.

¶37.    On appeal, this Court cited *Crawford*, pointing out that the court should not allow the admission of testimonial statements of a witness who did not appear at trial unless: (1) he is unavailable to testify, *and* (2) the defendant has had a prior opportunity for cross-examination. *Id*. at 1154 (¶24) (citing *Crawford*, 541 U.S. at 53-54). There was no dispute that Street was present for trial but was dismissed without being subject to either direct or cross-examination. The key issue was whether the use of the prior *unsworn* tape-recorded statement violated Owen's right to confront all witnesses. *Id*. at (¶25). We held that although Street was clearly unavailable (satisfying the first element of *Crawford*), he was not able to be cross-examined prior to becoming unavailable (thus failing to meet the second element of *Crawford*), and the recorded statement was ruled inadmissible. *Id*. at (¶25). Nonetheless, we ultimately found that the admission of the recording was harmless error

18

because three other witnesses testified that Owen had conspired to cover the tattoo in order to prevent an in-court identification. *Id*. at (¶26).

¶38. Similar to *Owen*, in the present case there is no dispute that DJ's audio-recorded statement to Warrington was testimonial. But, in this case, DJ was clearly available to testify. The court had deemed him competent to testify despite his age, and he was at the courthouse during the trial. Thus, the first element of *Crawford* was not met. Further, the State simply decided not to call him to testify but still introduced the recorded statement without giving Littleton any prior opportunity to cross-examine DJ. Thus, the second element of *Crawford* was not met. Therefore, the recorded statement clearly was inadmissible under *Crawford* and *Owen*.

¶39. During oral arguments on appeal, the State conceded that the introduction of the admittedly testimonial statement without calling DJ as a witness was "likely error." In its brief and during oral arguments, however, the State argued that any error was harmless because Littleton had the *opportunity* to call DJ but declined to do so; thus, "Littleton's confrontation right was not violated—it was discarded." The State cites *Rubenstein v. State*, 941 So. 2d 735 (Miss. 2006), in support of this argument. In *Rubenstein*, the defendant claimed that the admission of written statements made by witnesses violated his Sixth Amendment right to confront witnesses. *Id*. at 764 (¶110). However, the defense attorney *never objected* to the violation of the Confrontation Clause and thus waived the issue. *Id*. at 751, 760, 762, 765-66 (¶¶26, 84, 100, 113, 114, 122).

¶40. While it is true that a defendant can waive his right to confrontation by failing to

19

timely object,[6] in this case Littleton's attorney *did* object to the court's admission of the recorded statement without first requiring the State to call DJ as a witness. It was only after the court erroneously stated that Littleton could call DJ himself to prevent any Confrontation Clause issues that Littleton's attorney conceded and said the defense would call DJ as a witness. Whether this decision was trial strategy or simply making do with the trial court's ruling is unclear. However, it is clear that Littleton timely objected to the admission of the recorded statement, arguing the State's admission of the recording through Warrington was "a back door attempt to get the recording in and then not call [DJ] as a witness." Thus, *Rubenstein* is distinguishable from the present case.

¶41. Lastly, the State argued that it was only required to *subpoena* witnesses upon which recorded statements were admitted, not necessarily call those witnesses to testify, citing *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009). However, in *Melendez-Diaz*, the United States Supreme Court stated that "fundamentally, the Confrontation Clause imposes a burden on the prosecution to *present* its witnesses, not on the defendant to bring those adverse witnesses into court." *Id*. The State's interpretation of the Confrontation Clause in this case presents the exact same problem that the Supreme Court resolved in

---

[6] In *Brewer v. State*, 233 So. 2d 779, 780 (Miss. 1970), the Mississippi Supreme Court established that the right to confrontation may be waived. In *Waldon v. State*, 749 So. 2d 262, 266 (¶9) (Miss. Ct. App. 1999), we reiterated this standard, citing both *Brewer* and *United States v. Stephens*, 609 F.2d 230, 232-33 (5th Cir. 1980):

> [C]ounsel in a criminal case may waive his client's Sixth Amendment right of confrontation by stipulating to the admission of evidence, so long as the defendant does not dissent from his attorney's decision, and so long as it can be said that the attorney's decision was a legitimate trial tactic or part of a prudent trial strategy.

20

*Melendez-Diaz*: that to allow the State to introduce testimonial statements, instead of calling the affiant, shifts the burden of rebutting the statement to the defendant and thus removes the defendant's right to rest on the State's failure to prove its case. In other words, because the State was able to introduce DJ's recorded statement and not call DJ to testify, Littleton was *forced* to proceed to either call DJ as a hostile witness or not have DJ testify at all. This removed a vital protection for the defendant and essentially required him to prove his innocence and call a witness adverse to his own interests.

¶42. We find Littleton's argument compelling. Our judicial system is based on the presumption of innocence. This presumption requires the State to call all witnesses and submit evidence to prove each element of its case. While some defenses require the defendant to present evidence to prove his or her theory of defense,[7] when a defendant presents a self-defense claim, the burden is on the State to overcome that defense of necessity beyond a reasonable doubt. By allowing the State to enter DJ's recorded statement without calling DJ, the court effectively shifted the burden of proving self-defense to Littleton. However, the State has the burden of proving that Littleton did not act in self-defense. *Moss v. State*, 190 So. 3d 9, 14 (¶13) (Miss. Ct. App. 2015). Based on *Crawford*, *Owen*, and *Melendez-Diaz*, it is clear that in order to admit testimonial evidence given by a witness, that

---

[7] For instance, in cases where a defendant requests a lesser-included offense instruction, the defendant is required to point to some evidence in the record upon which a reasonable juror could find him both not guilty of the indicted offense and guilty of the lesser-included offense. If such evidence is not in the record, the defendant is required to put that evidence into the record, or else the defendant is not entitled to such an instruction. *Davis v. State*, 380 So. 3d 937, 941 (¶10) (Miss. Ct. App. 2023) (citing *Gilmore v. State*, 119 So. 3d 278, 286 (¶13) (Miss. 2013)).

witness must be both unavailable to testify, and the defendant must have been given the *prior opportunity* to cross-examine that witness. *Crawford*, 541 U.S. at 60. The recording was clearly a testimonial statement. DJ was available to testify, but Littleton was never able to cross-examine him. Under *Crawford*, this clearly violated Littleton's right to confrontation. Therefore, we find that the circuit court erred in admitting the recording of DJ's recorded statement without first calling DJ to testify.[8]

## II.    Whether admission of the recording was harmless error.

¶43.    Despite conceding that the introduction of the statement without calling DJ as a witness was "likely error" in its oral argument before our Court, the State contends that this error was harmless due to the overwhelming evidence presented by the prosecution to rebut Littleton's self-defense claim. Indeed, "[t]he well-settled standard for determining whether a constitutional error is harmless is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Willis v. State*, 352 So. 3d 602, 614 (¶31) (Miss. 2022). Such errors are considered harmless when the weight of the evidence against the defendant is overwhelming. *Id*. A conviction should be set aside for such constitutional violation unless this Court can "confidently say, on the whole record, that

---

[8]    It is worth noting that while neither party argued this point in the briefs or during oral argument, DJ's statement was clearly hearsay. "A witness's testimony is evaluated on the basis of four factors: perception, memory, narration, and sincerity. In order that the testimony can be properly considered in the light of these factors, the testimony should comply with three conditions. The witness should testify (1) under oath, (2) in the presence of the trier of fact, and (3) be subjected to cross-examination." MRE art. VIII, preface. *See also Jones v. State*, 881 So. 2d 209, 219 (¶38) (Miss. Ct. App. 2003) (holding that "without the testimony of a sponsoring witness with personal knowledge of the facts contained therein, a report is inadmissible, rank hearsay.").

the constitutional error was harmless beyond a reasonable doubt." *Id.*

¶44. Littleton testified that Thomas had a 9-millimeter Ruger, and that after Thomas took DJ outside, rushed back onto the porch with the 9-millimeter gun in hand. When Thomas began to cock the gun, Littleton, in fear for his life, started shooting. Based on this account of events, Littleton claimed self-defense and the State had the burden of proving that the shooting was not in self-defense. Because a *Weathersby*[9] instruction was given, the jurors were aware of their duty to believe Littleton's testimony unless "substantially contradicted in material particulars" by the State's witnesses. Thus, in determining if this was harmless error, critical is the proof that the State presented that rebutted Littleton's story, aside from DJ's recorded statement that Thomas did not have a gun.

¶45. However, aside from DJ's recorded statement, no evidence "substantially contradicted" Littleton's self-defense claim. Since no one actually witnessed the shooting, including DJ, the State relied on testimony from Dr. LeVaughn to say that Thomas was shot in the back, thus indicating he was not a threat to Littleton. However, LeVaughn's testimony contradicted the forensic examiners report that said the wound was in the "flank." He also conceded that the direction of the wound indicated that Thomas may have been moving at the time of the shooting and, thus, could have been facing Littleton when Littleton started shooting but was facing away when a bullet actually hit Thomas. The State also relied on the

---

[9] The *Weathersby* rule states that "where the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the [S]tate, or by the physical facts or by the facts of common knowledge." *Weathersby v. State*, 165 Miss. 207, 209, 147 So. 481, 482 (1933).

gunbox in Littleton's room and the location of the 9-millimeter Ruger under the couch to argue that the 9-millimeter actually belonged to Littleton and not Thomas. However, Littleton said that the gunbox was for his .45-caliber Ruger and that he kicked the 9-millimeter gun under the couch after he shot Thomas to prevent Thomas from using the gun on him in retaliation.[10] The State, however, never produced the gunbox, so whether it was for the 9-millimeter Ruger or the .45-caliber Ruger was not clearly established during the trial.[11]

¶46. The State conceded in its brief that Moore, the only other person near the shooting, only saw the "light from the 'flare' of the gun" and that she "could not see Littleton." Moore did not testify about the direction Thomas was facing, nor did she ever say anything about whether Thomas had a gun. Instead, after hearing the gunshots, she immediately sped away from the scene of the shooting. Thus, the State presented no eyewitness testimony that rebutted Littleton's version of events that Thomas was armed except for DJ's recorded statement. The evidence in the form of expert witnesses and photographs did not substantially contradict Littleton's story because they were at best speculative and at worst contradictory. Indeed, some of the photographs the State submitted actually corroborated Littleton's claims, such as those showing marks on the floor from the 9-millimeter gun being

---

[10] Despite Warrington saying that there were no scuffs on the floor that would indicate the 9-millimeter had been kicked under the couch, there are photographs in the record which show marks on the floor that contradict this statement.

[11] The State also relied on Warrington's testimony that there was no blood on the threshold of the doorway, where Littleton said Thomas was standing. However, pictures in the record clearly show drops of blood on the doorway precisely where Littleton said Thomas was standing at the time of the shooting.

dropped and the drops of blood in the doorway. The only testimony the State offered to establish that Thomas was unarmed was the child's recorded hearsay. Thus, by necessity, the statement must have influenced the verdict, as the verdict could not have stood without it. The jury would have been required under *Weathersby* to accept Littleton's recount as true because it was reasonable and was not substantially contradicted by material particulars. Thus, without DJ's statement, we cannot "confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." Based on the above reasoning, we find the admission of DJ's statement was not harmless error.

### III. Whether the jury instructions properly informed the jury of the duty to acquit.

¶47. Littleton originally proposed defense instruction D-2, which included language stating, "If you find that the State did not prove beyond a reasonable doubt that the Defendant did not act in self-defense, then you shall find the Defendant not guilty of murder." But this instruction was refused in favor of the amended instruction, which simply read, "The State must prove beyond a reasonable doubt that the Defendant did not act in reasonable self-defense."

¶48. Littleton argues that the instructions given on self-defense, reasonable force, and apparent threat all failed to inform the jury that it *must* acquit Littleton if the jury found he acted in self-defense. Littleton points to the proposed model jury instruction for self-defense, which reads:

> The court instructs the jury that to make a killing justifiable on the grounds of self-defense, the danger to the defendant must be either actual, present and urgent, or the defendant must have reasonable grounds to believe that the

25

victim intended to kill the defendant or do him some great bodily harm, and in addition to this, he must have reasonable grounds to believe that there is imminent danger of such act being accomplished. It is for the jury to determine the reasonableness of the grounds upon which the defendant acts. If you, the jury, unanimously find that the defendant acted in self-defense, *then it is your sworn duty to return a verdict in favor of the defendant*.

Mississippi Model Jury Instructions (Criminal) § 2:13 (Miss. Jud. Coll. 2023-2024 ed.) (emphasis added). Based on this model jury instruction, Littleton argues that the court should have given his proposed instruction D-2.

¶49. In *Woods v. State*, 996 So. 2d 100 (Miss. Ct. App. 2008), this Court held that a trial court's failure to instruct the jury that it must acquit the defendant if it found that she acted in self-defense constituted reversible error. *Id.* at 103 (¶16). In that case, we found that an instruction that provides a definition for self-defense is not enough; rather, "[w]hat the jury is to do with that definition must be provided with additional language." *Id*. (citing *Reddix v. State*, 731 So. 2d 591, 595 (¶20) (Miss. 1999)). Based on this caselaw, and the fact that none of the instructions explicitly informed the jury that it *must* acquit Littleton if it found that he acted in self-defense, we hold that the trial court abused its discretion in refusing to give the proposed defense instruction D-2.

¶50. The State argues that the instructions, when read as a whole, properly informed the jury that it must acquit, pointing to language in the given instruction 3, which informed the jury that "[s]hould the State fail to prove any of these elements to First-Degree Murder, then you shall find the Defendant not guilty of First Degree Murder."

¶51. While this instruction did inform the jury that it had a duty to acquit Littleton should the State fail to prove any element of murder, the instructions did not inform the jury that if

26

the State failed to prove that Littleton did not act in self-defense, then the jury must also acquit. Indeed, the proposed model jury instructions for self-defense clearly state that "it is your sworn duty to return a verdict in favor of the defendant" should the State fail to prove beyond a reasonable doubt that the defendant did not act in self-defense. Mississippi Model Jury Instructions (Criminal) § 2:13. Further, in *Woods* we held that where an instruction on self-defense does not state that the jury *must* or has a *duty* to acquit should they find that the defendant acted in self-defense, reversible error occurred. *Woods*, 996 So. 2d at 105 (¶25). Thus, we find the trial court abused its discretion in refusing to give the proposed defense instruction stating the jury's duty to acquit should it find Littleton acted in necessary self-defense.

## CONCLUSION

¶52. Having found sufficient grounds to reverse and remand for a new trial, we need not address Littleton's remaining claims. Littleton's Sixth Amendment right to confront all witnesses against him was violated when the court admitted DJ's recorded statement without requiring the State to call DJ as a witness. This error was not harmless, as it went directly to the issue of self-defense, the primary theory of defense at trial, and the other evidence produced by the State was not overwhelming. The court also abused its discretion in refusing defense instruction D-2, which explained that it was the jury's duty to acquit should it find that Littleton acted in necessary self-defense. Due to these errors, we reverse Littleton's conviction and remand for a new trial.

¶53. **REVERSED AND REMANDED.**

27

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McCARTY AND SMITH, JJ., CONCUR. LAWRENCE AND EMFINGER, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**